Filed 8/9/22  P. v. Halo CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>PETER HALO et al.,<br><br>    Defendants and Appellants. | C092509<br><br>(Super. Ct. No. 17FE006817) |

Following a jury trial, codefendants Shaun Smith and Peter Halo were found guilty of numerous counts of violating Penal Code sections 487 (grand theft) and 115 (offering false documents for recording).[1]  On appeal, Smith argues his entire judgment of conviction must be reversed because (1) he was not brought to trial within 60 days, in violation of section 1382, and (2) the court erroneously and prejudicially allowed the

---

[1]  Further undesignated statutory references are to the Penal Code.

1

People's expert to offer an incorrect opinion on a question of law.[2]  Halo argues his convictions on four counts of violating section 115 must be reversed because they are not supported by substantial evidence.

As to Smith, we conclude he was not brought to trial within 60 days in violation of section 1382, but reversal is not required because he fails to show prejudice.  We thus affirm Smith's judgment of conviction.  As to Halo, we conclude his conviction on two counts of violating section 115 are not supported by substantial evidence, and we thus reverse the convictions as to those counts; in all other respects, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

The facts are complicated, and the following is a greatly abbreviated version. Additional facts are provided in the relevant discussion sections, below.

This case arises from a series of transactions related to real property located at 9020 Bradshaw Road in Elk Grove, which we refer to simply as "the property."  The property encompassed approximately five acres and had two houses on it.  Monna Sue Ayers owned the property and lived in one of the houses until her death in 2019.

Ayers held the property in her trust, and her son, Dewey Brazeal, Sr.[3] was the trustee.  Dewey died in September 2011.  Sometime before he died, Dewey transferred the property from Ayers' trust to himself, and then into his own trust.

After Dewey died, Carolyn Puschman, Ayers' niece, became the successor trustee of Ayers' trust, and Karen Brazeal, Dewey's ex-wife, became the successor trustee of Dewey's trust.

---

[2]  Smith also "joins in and adopts by reference any arguments made by co-appellant Halo that may accrue to his benefit."  None do.

[3]  We refer to Dewey by his first name to avoid confusing him with Karen Brazeal, whom we refer to as Brazeal.

### Puschman Petition

Sometime after Puschman became the trustee of Ayers' trust, she learned that Dewey had transferred the property to himself. Puschman believed the transfer was done without Ayers' knowledge or permission or was the result of coercion, undue influence, or duress. She thus hired an attorney to file a petition in probate court to get the property back. The petition named the following three persons known to claim an interest in the property: Brazeal, as trustee of Dewey's trust; Kari Pace, Dewey and Brazeal's daughter; and Dewey Brazeal, Jr., Dewey and Brazeal's son. The petition asked the court (1) to determine that Puschman, in her capacity as the trustee of Ayers' trust, was the true owner of the property; and (2) to order Brazeal, in her capacity as the trustee of Dewey's trust, to transfer the property to Puschman. The petition was filed on September 24, 2012, and was served on Brazeal. Brazeal hired an attorney to represent her, and Smith was a paralegal who worked with the attorney on the case.

### Halo Attempts to Sell the Property to Akash Lal (2012)

In the meantime, sometime in 2011, Halo met Brazeal and Pace. Halo was a real estate broker and property manager, and he managed the rental property that Brazeal and Pace were living in. Halo learned that Pace was going through a divorce, and he recommended that she contact Smith to see if he could help. Halo had met Smith several years before, and he knew Smith owned a legal services business called Quality Law For Less and specialized in family disputes.

In late 2012, Halo showed the property to a real estate investor named Akash Lal. Halo told Lal a tenant (presumably referring to Ayers) was living in one of the houses and there was some type of dispute over it, but he did not elaborate. Lal agreed to purchase the property for $215,000 and signed a standard purchase contract in December 2012. Halo was the listing agent and represented both the buyer and the seller (Brazeal). Lal put down a $2,500 deposit with First American Title. Escrow was supposed to close by March 15, 2013. When escrow did not close, Lal contacted the title company, who

3

told him there was a problem with title. Lal also contacted Halo who said the problem with title involved a dispute between family members and he was working to resolve it. Halo asked Lal to give him $15,000 to give the family an incentive to move out. Lal found the request "very odd" and declined. He testified the deal ultimately "fizzled" because of the title problem.

### Brazeal Transfers the Property to Smith (2013)

In or around March 2013, Brazeal transferred the property to STS Integrity, LLC (STS), Smith's company, as payment for his services.[4] A grant deed from Brazeal (as trustee of Dewey's trust) to STS was signed on March 15, 2013, and recorded on June 5, 2013.

### Puschman Records a Lis Pendens (2013)

On July 19, 2013, and again on August 14, 2013, Puschman's attorney recorded a lis pendens regarding the Puschman petition, and both lis pendens were served on STS.[5]

### Smith Sells Half of the Property to Linda Reyes (2013)

Around September or October 2013, Smith (through STS) sold half of the property to Linda Reyes for $115,000 (and we note that Halo was not involved in it).[6] Reyes was recently retired and was looking to purchase a home. She had known Smith since he was six years old when she was in a relationship with his father. Reyes had never purchased a house before and "didn't know the requirements of buying the home." She "trusted" Smith. Smith never told her there was litigation involving the property and he never

---

[4] The nature of these services is unclear.

[5] A lis pendens is a notice of the pendency of an action in which a "real property claim" is alleged. (Code Civ. Proc., § 405.20.) A "real property claim" is a "cause or causes of action in a pleading which would, if meritorious, affect . . . title to, or the right to possession of, specific real property." (Code Civ. Proc., § 405.4.)

[6] The contract does not state which portion of the property was sold to Reyes.

4

mentioned a lis pendens. Reyes made three payments to Smith for a total of $108,450, with the bulk of the money coming from her retirement account. After she made the last payment, she thought she owned the house, and it was her intention to live there. On October 9, 2013, Smith signed a grant deed transferring "an undivided 50% interest" in the property from STS to Reyes. Smith then gave Reyes a copy of the deed and told her to record it. When she tried to do so, however, the recorder's office said they could not accept it because it was a copy and not the original. After the recorder's office rejected the deed, Reyes tried to call Smith "[a]lmost every day" but he never answered. In May 2014, Reyes hired an attorney and sued Smith over the property. Reyes's attorney ultimately obtained a title report and concluded Smith never actually owned the property, and thus had not conveyed title to Reyes. Reyes never got her money back.

### Smith Sells Half of the Property to Majadi and Edley Scruggs (2013)

A few months after selling half of the property to Reyes, Smith (through STS) sold the other half to Majadi and Edley Scruggs.[7] A grant deed memorializing the transfer was signed on December 4, 2013, and recorded on December 6, 2013.

### Granting of Puschman's Petition (2014)

At a probate hearing held in April 2014, the court granted Puschman's petition, and declared she was the true owner of the property.[8]

### Halo Brokers a Sale of the North Half of the Property from the Scruggs to Christian Reynoso (2014)

In the fall of 2014, Halo brokered a sale of the north half of the property from the

---

[7] A copy of the contract evincing this sale was not produced at trial.

[8] The order granting the petition was not entered until January 9, 2015.

5

Scruggs to his nephew, Christian Reynoso[9] (and we note that Smith was not involved in it). The deal was that Reynoso would own 75 percent of the north half of the property and Halo would own 25 percent. Halo and Reynoso intended to fix the property up and rent it out. The purchase price was $130,000, and the deal was financed by the Scruggs. Interest only payments were due monthly, and a final balloon payment of $100,000 was due on November 30, 2016. Reynoso wrote Halo a $37,500 check as a down payment, and thereafter made monthly payments to Halo, with the understanding that Halo would make all required payments to the Scruggs. In total, Reynoso paid Halo $73,000. Halo obtained a grant deed and a quitclaim deed from the Scruggs granting the north half of the property to Reynoso; both deeds are dated December 19, 2014.[10] Halo testified the plan was that he would hold on to the deeds until the purchase price "was paid in full."[11] At some point, Halo told Reynoso they had "lost" the house because "a stepmother or a grandma had pulled an old will out, and had just taken the house from the person who had owned" it. Halo never gave Reynoso either of the two deeds he was holding on to, and they were never recorded.

### Smith Sells Half of the Property to Eman and Eisar Askari (2015)

Finally, in mid-2015, Smith sold half of the property to brothers Eman and Eisar Askari for $115,000.[12] Halo brokered the deal. Halo did not tell the Askaris there was a

---

[9] The sale was actually to Christian and Andrea Reynoso as husband and wife. Because the parties refer to this simply as the Reynoso sale, we do too.

[10] It is unclear why Halo obtained two deeds.

[11] A handwritten "addendum" signed by Halo and Scruggs (but not Reynoso) states: "I Peter Halo am acting as the 3rd party in this sale and will only hold the signed 'grant deed.' The deed will not be recorded until the seller is paid in full $130,000. . . . The quit claim deed also has the same guidelines."

[12] The contract for this sale states it is for the south side of the property.

lawsuit regarding the property, and he told them "there is no need for a title company." He also told them an old woman currently lived in the house, that she was "dying, and she wants to die in the house," and that she was not to be disturbed. The Askaris paid a total of $122,500 for the property. A grant deed transferring "an undivided 50% interest" in the property from STS to the Askaris was signed by Smith on June 9, 2015. The Askaris tried to record the deed but it was rejected because it was not filled out correctly. A second grant deed was prepared, signed by Smith on September 28, 2015, and recorded on September 30, 2015. The Askaris thought the recording meant they owned the property, so they left a note on the gate asking the tenant to call them. Puschman called them, and when they told her they owned the property, she started crying and said, "Don't tell me again I have to do this with Mr. Halo and Mr. Smith all over again." Puschman eventually provided the Askaris with paperwork that convinced them the purchase was not legitimate. The Askaris never got their money back.

Halo and Smith were charged with three counts of grand theft by false pretenses in violation of section 487, subdivision (a) (counts one, three & six), and five counts of procuring or offering a false instrument to be recorded in violation of section 115, subdivision (a) (counts two, four, five, seven & eight). As to the grand theft counts, the prosecution's theory was that Halo and Smith defrauded Reyes, Reynoso and the Askaris out of the money they paid for the property. As to the section 115, subdivision (a) counts, the prosecution's theory was that the various deeds to the property were false instruments that were recorded or offered for recording.

The jury found Halo and Smith guilty on all counts. Both defendants timely, and separately, appealed.[13]

---

[13] This case was fully briefed and assigned to this panel on April 29, 2022.

7

# DISCUSSION

## I

### *Smith's Appeal*

#### A. *Section 1382 and the Right to a Speedy Trial*

##### 1. *Additional Relevant Facts*

After Smith was arraigned, he initially consented to various continuances of his trial date beyond the 60-day deadline because he was out on bail. On April 15, 2019, however, Smith's bail was increased, and he was taken into custody. From that point forward, he refused to consent to additional continuances of the deadline.

When Smith was taken into custody, trial had already been set for May 6, 2019, and Smith acknowledges he consented to that date. At that point in time, Smith was representing himself.

On February 6, 2019, two months prior to being taken into custody, Smith had filed a petition for writ of mandate in this court with a request for a stay.[14] On April 30, 2019, this court issued an order staying the trial, and on August 14, 2019, it vacated the stay. The parties agree that August 14, 2019, is the date the 60-day clock started running, and we do too. (See, e.g., *Matthews v. Superior Court* (1973) 35 Cal.App.3d 589, 596 ["where proceedings in prohibition are instituted by an accused and during the pendency of such proceedings the appellate court issues an order staying the trial, the accused, upon the denial of such petition for prohibition and the concomitant termination of the stay, must be brought to trial within 60 days from the date of the order denying the petition"].) Pursuant to section 1382, Smith thus had to be brought to trial by October 13, 2019.

At a hearing held on August 23, 2019, the trial court set the trial for October 10, which was within the 60-day period.

---

[14] The petition is unrelated to the current appeal.

8

At a hearing held one month later, on September 26, Halo's attorney asked to continue the trial date because his client had recently been diagnosed with leukemia and was scheduled to undergo chemotherapy on October 8 through 11, November 1 through 3, and December 10 through 12. He asked that the trial be continued to January 8, 2020. Smith's recently appointed attorney, Russell Miller, stated Smith did not agree to waive time. Miller also stated he was still in the process of reviewing discovery, and he had received "somewhere around 8,000" pages out of "roughly some 13,000 pages of discovery." Miller clarified, however, that he was *not* requesting a continuance "at this time . . . because I don't have enough information to do so." The trial court found Halo's medical condition constituted good cause to continue the trial, but stated it was not "quite yet" prepared to continue the trial to 2020 because "we don't know at this point how Mr. Halo is going to feel in November or even December." The court thus continued the trial for 30 days, to October 31, 2019. It also scheduled a status conference for October 25, 2019, and stated if either defendant wanted to request another continuance, it would be heard on that date.

Neither Smith nor Miller were present at the status conference on October 25, although Halo's attorney specially appeared on behalf of Miller. The court trailed the trial to November 7, 2019.

On November 1, 2019, Miller filed a motion to continue the trial. In support of the motion, Miller stated he was currently involved in a complex homicide trial (*People v. Chiles* (Super. Ct Sacramento County, No. 15F02436)) that was "pre-assigned" to Department 15 on or about October 1, and he was scheduled to start another homicide trial (*People v. Nunally* (Super. Ct. Sacramento County, No. 12F07000)) immediately thereafter. As a result, he stated, he had not had time to review Smith's case. The motion was heard that same day. Smith was present and objected to the continuance. The trial court granted the motion, noting Miller was "currently in a murder trial. He's been assigned to a department to do two consecutive trials, which will mean he's unavailable

9

until at least the beginning or middle of December . . . . [¶] . . . [¶] . . . That is good cause to continue a trial." The court also noted Halo was still recovering from cancer treatments and "we need to give some consideration to [Halo's counsel] being able to work with his client." Finally, the court stated there would "be no further motion to continue for Mr. Miller." The court continued the trial to January 8, 2020.

On January 7, 2020, Miller filed a second motion to continue the trial. In support of this motion, he stated he was currently involved in a complex trial (*People v. Denton* (Super. Ct. Sacramento County, No. 12F03149)) that had been "pre-assigned" several months ago, and he was thereafter scheduled to start another complex trial (*People v. Nunally, supra*, 12F07000) that had also been "pre-assigned" several months ago.[15] He asked that trial be continued to the middle of February. A hearing on the motion was held on January 8, 2020, (the date the trial was scheduled to start). At the hearing, Miller told the court his next available date was February 19. Over Smith's objection, the trial court granted the motion, stating, "I have reviewed your motion, Mr. Miller. I'm well aware that you're pre-assigned to two matters that are much older than this case and that need to get tried. [¶] I know they've been pre-assigned so I'm going to find good cause to continue this matter." The court reiterated, "I will find good cause due to Mr. Miller's pre-assigned trial schedule on cases that are unfortunately, Mr. Smith, older than yours and need to get out." The court continued the trial to February 19, 2020.

On February 19, Halo's attorney specially appeared for Miller and informed the court Miller "is in trial . . . and his first available date . . . is March 4. We're asking the Court to find good cause until March 4th." Smith objected, noting that when Miller's first motion to continue was granted back in November, the judge had stated there would be no more continuances. The trial court found good cause to continue the trial, noting

---

[15] We note that Miller also cited the *People v. Nunally* case when he filed his first motion to continue.

"the alternative is if I . . . appoint a new attorney, that attorney is not going to be ready." The court continued the trial to March 4, 2020, and stated "that will be a date certain."

March 4 did not turn out to be a date certain. Instead, on March 2, Miller filed another motion to continue the trial to April 13 because he was presently in a jury trial (*People v. Rejon* (Super. Ct. Sacramento County, No. 17F020466)) that had been pre-assigned several months ago. We note this was Miller's fourth request to continue the trial, all of which were primarily due to Miller's unavailability. At a hearing on March 4, Smith again objected to the continuance, citing his right to a speedy trial. The trial court asked Smith if he was requesting a new attorney because his current attorney was not prepared to go to trial until April. When Smith responded that he was merely "objecting to my constitutional rights," the court stated, "Then it's the Court's decision because I'm wondering if I appoint another counsel whether that counsel would be prepared to go prior to April 13th." The prosecutor stated discovery exceeded 13,000 pages, and the court responded, "just based on that information I do not believe if I appointed another counsel, it doesn't seem realistic that counsel, who will also have his or her other caseload, would be prepared to go on this case that involves 13,000 pages by April 13th. I have reviewed Mr. Miller's written motion. I will find good cause to continue the matter to April 13th."

Trial did not go forward on April 13, although this time the delay was not caused by Miller's trial schedule. Instead, it was caused by the COVID-19 pandemic. On March 23, the Chief Justice of the California Supreme Court issued an order suspending and continuing all jury trials for 60 days, and also extending by 60 days, section 1382's time period for holding criminal trials. This order was later extended for an additional 30 days. Criminal jury trials were thus on hold, and section 1382's time limits were suspended, from March 23 until on or about June 21. During this period, in or around April, a new attorney (Jesse Ortiz) was retained to represent Smith.

On June 15, Smith filed a motion to dismiss pursuant to section 1382. It was

11

denied, with the court ruling as follows: "[G]iven the nature and justification for the delays, and the nature of the prosecution, this is not a case in which the state 'realistically bears responsibility for counsel's unavailability because of its chronic failure to provide a number of public defenders or appointed counsel sufficient to enable indigent defendants to come to trial within the prescribed statutory period.' (*People v. Sutton*, *supra* at p. 552.) The delays involving trial counsel were unforeseen, and constituted good cause to continue the trial date."

On June 29, Smith, acting in pro. per., filed a handwritten petition for writ of mandate challenging the order denying his motion to dismiss. The petition was denied on July 1. On July 9, Smith filed a petition for review in the California Supreme Court, which was denied on July 15.

In the meantime, Smith's trial began on July 6, 2020. By the time his trial began, 328 days had passed since section 1382's 60-day clock started ticking, and Smith was incarcerated throughout.

2.    *Analysis*

Section 1382 implements a criminal defendant's right to a speedy trial.[16] "The statute provides that, in a felony case, the court shall dismiss the action when a defendant is not brought to trial within 60 days of his or her arraignment on an indictment or information, unless (1) the defendant enters a general waiver of the 60-day trial requirement, (2) the defendant requests or consents (expressly or impliedly) to the setting of a trial date beyond the 60-day period (in which case the defendant shall be brought to trial on the date set for trial or within 10 days thereafter), or (3) 'good cause' is shown." (*People v. Sutton* (2010) 48 Cal.4th 533, 545 (*Sutton*).)

---

[16] The federal and state Constitutions also guarantee criminal defendants the right to a speedy trial (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15, cl. 1), but Smith does not raise a constitutional claim. Instead, he argues only that section 1382 was violated.

It is undisputed that Smith was not brought to trial within 60 days of August 14, 2019, as required by section 1382. The first question we must determine is whether good cause existed for the delay. If the answer is *yes*, our analysis ends. If the answer is *no*, we must then consider Smith's argument that prejudice need not be shown in the circumstances of this case.

### a. Good Cause

The trial court " ' "has broad discretion to determine whether good cause exists to grant a continuance of the trial" ' " (*People v. Riggs* (2008) 44 Cal.4th 248, 296), and "we review a trial court's decision to grant a continuance for good cause for abuse of discretion" (*Burgos v. Superior Court* (2012) 206 Cal.App.4th 817, 824).

In order to comply with section 1382, Smith had to be brought to trial by October 13, 2019. He was not brought to trial until July 6, 2020, which, as he accurately notes, is almost nine months after the 60-day deadline had passed. It is clear, however, that Smith does not challenge all nine months of the delay.

Smith's first trial date—October 10, 2019, which was within the statutory deadline—was continued based entirely on Halo's medical condition. It is well established that illness constitutes good cause within the meaning of section 1382—and Smith does not suggest otherwise.[17] (See *Sutton, supra*, 48 Cal.4th at p. 549; *People v. Johnson* (1980) 26 Cal.3d 557, 570 (*Johnson*).) It is also well established that if one defendant establishes good cause to continue the trial, "the state's strong interests in conducting a single joint trial provides good cause . . . to also continue the trial of a codefendant's case to maintain joinder"—and, again, Smith does not suggest otherwise.

---

[17] In a footnote, Smith notes that Halo failed to provide supporting "documentation" regarding his medical condition and treatment. To the extent Smith contends the lack of documentation demonstrates a lack of good cause for the first continuance, we disagree because "[f]ootnotes are not the appropriate vehicle for stating contentions on appeal." (*Sabi v. Sterling* (2010) 183 Cal.App.4th 916, 947.)

13

(*Smith v. Superior Court* (2012) 54 Cal.4th 592, 602.) The trial court initially continued the trial to October 31, based on Halo's medical condition. The October 31 trial date was trailed within the 10-day trail period, to November 7. On November 1, Miller moved to continue the trial, and the court granted the motion and continued the trial to January 8, 2020. Although Halo's attorney did not expressly renew his motion to continue, it is clear to us that Halo's illness was a major reason the court continued the trial to January 8. At the November 1 hearing, the court stated it was "inclined to set this case for trial on January 8th," and immediately noted, "We need to give some consideration to [Halo's attorney] being able to work with his client and make sure that his client is able to work with counsel." We thus find Halo's illness constituted good cause to continue the trial to January 8, 2020.

From March 23, 2020, to approximately June 21, 2020, Smith's trial was delayed due to the Chief Justice's orders continuing all jury trials and extending section 1382's deadlines for 90 days due to the COVID-19 pandemic. We find the Chief's Justice's order constituted good cause to continue Smith's trial. (See, e.g., *Hernandez-Valenzuela v. Superior Court* (2022) 75 Cal.App.5th 1108, 1134 ["exceptional circumstances arising from the COVID-19 pandemic" constituted good cause for delaying trials beyond § 1382's limits].) Smith's trial started on July 6, 2020, shortly after the Chief Justice's order expired.

The primary focus of Smith's argument is on the period between January 8 and March 23, and on the continuances that were granted based on his attorney's "chronically jammed trial schedule." His argument is based almost entirely on a comparison of two California Supreme Court cases: (1) *Johnson, supra*, 26 Cal.3d 557, in which the court held good cause *did not* exist to grant three requests by the public defender to continue the defendant's trial 55 days beyond the 60-day deadline; and (2) *Sutton, supra*, 48 Cal.4th 533, where the court held good cause *did* exist to continue the trial six days beyond the 60-day deadline. Smith argues this case is more like *Johnson* than *Sutton*.

14

Because they are so central to Smith's argument, we begin by describing *Johnson* and *Sutton* in some detail.

The defendant in *Johnson* was arraigned on February 2 and trial was set for March 23. On that date, the public defender stated he was currently in trial, he had two other trials scheduled in cases that were older than the defendant's, and he was not available until May 6. Over the defendant's objection, the court found good cause to continue the trial. On May 6, the public defender requested another continuance on the ground he had three other trials to complete. Over the defendant's objection, the court again found good cause to continue the trial to June 14. On June 14, the case was called for trial, and the court "excused" counsel until June 23. A June 23 minute order noted the case was trailed by the court to June 27 " 'due to congested calendar,' " and trial actually began on that date. (*Johnson, supra*, 26 Cal.3d at pp. 563-565 & fns. 2, 3 & 4.) The defendant remained incarcerated pending trial.

The *Johnson* court began its analysis of the good cause issue by noting the continuances "were not sought nor granted to serve the best interest of the defendant; they stem from calendar conflicts of the public defender, and the decision of the public defender and the court to resolve these conflicts by trying other cases in advance of that of defendant." (*Johnson, supra*, 26 Cal.3d at p. 566.) It then noted that a defendant's right to a speedy trial may be "denied by failure [of the state] to provide enough public defenders or appointed counsel, so that an indigent must choose between the right to a speedy trial and the right to representation by competent counsel." (*Id.* at p. 571.)

The *Johnson* court also quoted approvingly from the American Bar Association's Standards for Speedy Trial: " '[D]elay arising out of the chronic congestion of the trial docket should not be excused . . . . [¶] But, while delay because of a failure to provide sufficient resources to dispose of the usual number of cases within the speedy trial time limits is not excused, the standard does recognize congestion as justifying added delay when "attributable to exceptional circumstances." Although it is fair to expect the state

15

to provide the machinery needed to dispose of the usual business of the courts promptly, it does not appear feasible to impose the same requirements when certain unique, nonrecurring events have produced an inordinate number of cases for court disposition.' " (*Johnson, supra*, 26 Cal.3d at p. 571.)  The *Johnson* court then held, "The same reasoning, distinguishing between chronic conditions and exceptional circumstances, applies to the delay caused by the crowded calendars of public defenders.  The state cannot reasonably provide against all contingencies which may create a calendar conflict for public defenders and compel postponement of some of their cases.  On the other hand, routine assignment of heavy caseloads to understaffed offices, when such practice foreseeably will result in the delay of trials beyond the 60-day period without defendant's consent, can and must be avoided.  A defendant deserves not only capable counsel, but counsel who, barring exceptional circumstances, can defend him without infringing upon his right to a speedy trial.  Thus *the state cannot rely upon the obligations which an appointed counsel owes to other clients to excuse its denial of a speedy trial to the instant defendant*." (*Id*. at p. 572, italics added.)

Applying these standards to the facts before it, the *Johnson* court found there was not good cause for the first or second continuance (and it never discussed the third continuance).  As to the first continuance, the court noted, "When the public defender moved for a continuance on March 23, he clearly posited his request not upon a benefit to Johnson but upon commitment to clients other than Johnson.  He revealed that his representation of other clients created a conflict which he proposed to resolve to Johnson's detriment.  Under these circumstances we think the court should inquire whether the assigned deputy could be replaced by another deputy or appointed counsel who would be able to bring the case to trial within the statutory period.  In some instances, appointment of new counsel will serve to protect defendant's right to a speedy trial.  If, on the other hand, the court cannot ascertain a feasible method to protect defendant's right, the court will have no alternative but to grant a continuance; upon a

16

subsequent motion to dismiss, however, the court must inquire into whether the delay is attributable to the fault or neglect of the state; if the court so finds, the court must dismiss." (*Johnson, supra*, 26 Cal.3d at pp. 572-573.) The court in *Johnson* found, however, that the trial court "did not inquire into any available means of protecting defendant's right to a speedy trial" and instead simply "accepted the public defender's recital of conflicting obligations without inquiring whether the conflict arose from exceptional circumstances or resulted from a failure of the state to provide defendant with counsel able to protect his right." (*Id*. at p. 573.) The court also held, "The same reasoning applies to the [second] continuance." (*Ibid*.)

Our Supreme Court again addressed the speedy trial issue and "clarified" some of *Johnson*'s language in *Sutton, supra*, 48 Cal.4th 533. The defendant in *Sutton* was arraigned on July 21, and trial was scheduled for September 11 (which was day 52 for purposes of § 1382). The case was transferred to the trial assignment department on September 15 (day 56). On September 15 (a Friday), all parties appeared, and the defendant's counsel stated he was engaged in another trial that he anticipated would be done on Monday. The court asked the defendant whether he would waive the 60-day deadline, and he said no. The court ordered the parties to appear on Monday, September 18 (day 59). On September 18, the defendant's counsel was still in trial, and the court stated it was " 'trailing this day to day.' " Indeed, the court brought the defendant and counsel into court every day, and when counsel advised that he was still engaged in trial, the court each time noted the defendant did not waive time, and it found good cause to continue the trial because counsel was in trial. Finally, on Monday, September 25, the trial began—66 days after the defendant was arraigned. The defendant was convicted on all charges. (See generally *Sutton*, *supra*, at pp. 540-544.)

Before turning to the issue of whether good cause existed for the six-day delay, our Supreme Court reviewed *Johnson* in some detail, and clarified the following broadly-worded sentence found in the introduction: "[T]he asserted inability of the public

17

defender to try such a defendant's case within the statutory period because of conflicting obligations to other clients does not constitute good cause to avoid dismissal of the charges." (*Johnson*, *supra*, 26 Cal.3d at p. 561.)  Based on this one sentence, the defendant in *Sutton* argued the public defender's conflicting obligations to other clients could *never* constitute good cause to continue the defendant's trial.  The court disagreed: "Although this introductory passage from *Johnson, supra*, 26 Cal.3d 557, relied upon by defendants—viewed in isolation—reasonably can be read as supporting defendants' claim, when we consider the opinion in *Johnson* in its entirety it is evident that the language in that passage is imprecise and overstates the decision's actual *holding* on the good-cause issue.  As the foregoing review of the opinion in *Johnson* reveals, the focus of the court's concern in *Johnson* with respect to the good-cause issue involved the impropriety of justifying a delay in trial upon appointed counsel's inability or unavailability to try the case when it is *the state* that realistically bears responsibility for counsel's unavailability because of *its chronic* failure to provide a number of public defenders or appointed counsel sufficient to enable indigent defendants to come to trial within the prescribed statutory period. [Citations.]  [¶]  As demonstrated by the circumstances of the present case, there are some (indeed, undoubtedly many) instances in which an appointed counsel's unavailability to try one client's case on a particular date because of a calendar conflict arising from counsel's obligations to another client cannot fairly be attributed to the fault or neglect of the state.  Here, [defendant's] counsel was unavailable on the 60th day after [defendant's] arraignment because another trial in which counsel was engaged ran longer than anticipated.  It is often difficult to predict how long a trial will take, and unexpected events that prolong another trial in which appointed counsel is engaged cannot fairly or reasonably be laid at the feet of the state.  This type of calendar conflict, although arising from appointed counsel's obligation to another client, clearly is distinguishable from the circumstances that were before the court in *Johnson, supra*, 26 Cal.3d 557." (*Sutton, supra*, 48 Cal.4th at pp. 552-553.)

After clarifying *Johnson*, the *Sutton* court found there was good cause to continue the defendant's trial six days beyond section 1382's 60-day deadline. Unlike the situation in *Johnson*, the *Sutton* court found that this delay could not "reasonably be attributed to the fault or neglect of the state." (*Sutton, supra*, 48 Cal.4th at p. 553.) In so finding, the court noted that the trial court in *Johnson* "followed a practice of routinely finding good cause to continue a trial date . . . solely to accommodate the public defender's chronic heavy backload of cases," and then granted lengthy continuances. (*Id.* at p. 554.) In *Sutton*, however, the trial court made a concerted effort to meet the 60-day deadline, and once that deadline approached, met with the parties "daily" and "on a day-to-day basis" in order "to ensure that the trial would not be unduly delayed." (*Ibid*.) Moreover, "as soon as counsel's other trial was completed, the trial of the present matter commenced." (*Ibid*.) The court thus concluded, "Unlike the situation in *Johnson*, the cause of the instant delay—an unanticipated extended duration of another trial in which a defendant's appointed counsel was engaged—was the type of contingency that may occur even in a reasonably funded and efficiently administered trial court system that handles a large volume of criminal cases." (*Ibid*.)

Smith argues this case is similar to, and even more egregious than, *Johnson* and nothing like *Sutton*. We agree.

As in *Johnson*, Miller was chronically unavailable for months due to a busy trial schedule. He requested—and was granted—four separate continuances, on November 1, 2019, January 7, 2020, February 19, 2020, and March 2, 2020.

As noted above, we find there was good cause to grant the first continuance (from November 7, 2019, to January 8, 2020) based on Halo's medical condition. We also find it relevant that on November 1, 2019, when Miller made his first request for a continuance, he had not been representing Smith for long. Miller first appeared on behalf of Smith at a hearing on August 23, 2019, and the court noted Miller had only "recently" been appointed. At the September 26 hearing on Halo's motion to continue, Miller noted

19

he was still in the process of reviewing the case and obtaining information from previous investigators, he had received 8,000 pages of discovery, he believed there were around 5,000 additional pages of discovery he had not yet received, and he had recently been informed by the prosecutor there was a corollary case. In his November 1st motion to continue, Miller stated he was currently involved in a complex homicide trial (*People v. Chiles, supra*, 15F02436) and was scheduled to start another homicide trial (*People v. Nunally, supra*, 12F07000) immediately thereafter. He also stated he was still completing his review of Smith's case; he had not yet had an adequate opportunity to review all the facts; and a continuance was necessary in order to ensure he could provide Smith with an adequate defense. Miller thus did not request a continuance solely because he was in trial, but also because he needed additional time to prepare for Smith's trial.

This is a complex and document-intensive case that involves the intersection of real property law and criminal law. Due to this complexity, we find it was not unreasonable to provide Miller with additional time to get up to speed on the case so that he could provide competent representation. (See *People v. Lomax* (2010) 49 Cal.4th 530, 556 ["If counsel seeks reasonable time to prepare a defendant's case, and the delay is for defendant's benefit, a continuance over the defendant's objection is justified"].) "When a defense attorney requests more time to prepare for trial, the trial court must balance a defendant's right to a speedy trial with his right to competent counsel." (*People v. Williams* (2013) 58 Cal.4th 197, 250.) At this early stage of the proceedings, we find there was good cause to continue Smith's trial in order to provide Miller additional time to prepare an adequate defense, particularly when combined with Halo's medical condition. We note, however, that, when it granted Miller's first request for a continuance, the trial court stated there would be "no further motion to continue for Mr. Miller." We also note that at a hearing on an unrelated motion held on November 22, the court asked Miller whether he would be ready to try the case on January 8, and he answered "yes." Unfortunately, Miller was not ready to try the case on January 8 and the

20

trial court granted three further motions to continue.

Based on the evidence before us, it appears that the trial court allowed Miller to prioritize his caseload, to the detriment of Smith. The trial court "routinely [found] good cause to continue [the] trial date . . . solely to accommodate [appointed counsel's] chronic heavy backload of cases" (*Sutton, supra*, 48 Cal.4th at p. 554), and "accepted [appointed counsel's] recital of conflicting obligations without inquiring whether the conflict arose from exceptional circumstances or resulted from a failure of the state to provide defendant with counsel able to protect his right" to a speedy trial. (*Johnson, supra*, 26 Cal.3d at p. 573.) In these circumstances, "the court should inquire whether [appointed counsel] could be replaced by another . . . appointed counsel who would be able to bring the case to trial within the statutory period." (*Id*. at p. 572.) It does not appear the court made such an inquiry when it granted the second continuance. When it granted the third and fourth continuances, however, the court appears to have concluded, without any evidence of such, that appointing new counsel would *not* protect Smith's right to a speedy trial, because new counsel would need time to prepare for trial. In this situation, *Johnson* teaches that "*a*" continuance may be granted, but upon a subsequent motion to dismiss, the court "*must*" dismiss the case if the delay "is attributable to the fault or neglect of the state." (*Id*. at pp. 572-573, italics and bold added.)

Delay is attributable to the fault or neglect of the state if it is caused by "chronic conditions" or the "routine assignment of heavy caseloads," rather than by "exceptional circumstances" or "unique nonrecurrent events." (*Johnson, supra*, 26 Cal.3d at pp. 571-572.) Here, there is no indication that the delay was caused by anything other than Miller's chronically congested trial calendar. Throughout the course of his numerous requests for a continuance, Miller stated he was unavailable because he was engaged in at least four other trials. There was nothing "exceptional," "unique," or "nonrecurring" about the fact that Miller was engaged in a different trial on all four of Smith's trial dates. (*Ibid*.) Instead, it appears Miller's calendar was simply chronically congested, which can

21

fairly be attributed to the fault or neglect of the state. (*Sutton, supra*, 48 Cal.4th at pp. 552-554.)

We also note that when the trial court granted Miller's second request for a continuance, it stated, "I will find good cause due to Mr. Miller's pre-assigned trial schedule on cases that are unfortunately, Mr. Smith, older than yours and need to get out." Although we certainly empathize with the trial court's reasoning that older cases must be tried before newer ones, *Johnson* teaches that " 'delay in run-of-the-mill criminal cases cannot be justified by simply asserting that . . . each case must await its turn.' " (*Johnson, supra*, 26 Cal.3d at p. 571, quoting *Barker v. Wingo* (1972) 407 U.S. 514, 538, (conc. opn. of White, J.).)

Finally, we note that this case is not like *Sutton*, where defense counsel was engaged in *one* trial that took longer than anticipated, and where the court made a concerted effort to meet the 60-day deadline by continuing the defendant's trial for just six days, on a day-to-day basis, until that one trial ended. (*Sutton, supra*, 48 Cal.4th at p. 554.) In contrast, Miller was engaged in a different trial on each of the three different dates that Smith's trial was scheduled to start, and rather than continuing Smith's trial on a day-to-day basis until Miller's trial ended, the court granted continuances of up to a month and a half. Sutton characterized continuances of 45 days, 40 days, and 13 days as "lengthy." (*Ibid*.) Here, the trial court granted similarly lengthy continuances (43 days, 15 days, and 41 days).

We recognize that trial courts faced with repeat motions to continue are placed in the difficult position of balancing a defendant's right to be brought to trial within 60 days, with appointed counsel's commitments to other clients, and with the need to try all criminal cases in a timely and fair manner. In this case, however, by the time the trial court granted Miller's fourth request for a continuance, the balance had tipped in favor of Smith's right to be tried within 60 days. We thus find Smith was denied his right to a speedy trial in violation of section 1382.

22

### b. *Prejudice*

We now come to the question of prejudice and whether Smith is required to show it. Smith argues he is not required to show prejudice. We disagree.

It is well established that, before trial, no showing of prejudice is required, and " 'an unexcused delay beyond the time fixed in section 1382 of the Penal Code without defendant's consent entitles the defendant to a dismissal.' "[18] (*People v. Martinez* (2000) 22 Cal.4th 750, 766; see also *Burgos v. Superior Court, supra*, 206 Cal.App.4th at p. 824 ["To obtain pretrial relief, petitioner is not required to affirmatively show prejudice from any delay in violation of section 1382"].) After trial, however, the rule changes, and a defendant raising a section 1382 violation on appeal from a felony conviction must show prejudice. (See *Johnson, supra*, 26 Cal.3d at p. 574 ["Upon appellate review following conviction, . . . a defendant who seeks to predicate reversal of a conviction upon denial of his right to speedy trial must show that the delay caused prejudice"]: *People v. Wilson* (1963) 60 Cal.2d 139, 151-152 (*Wilson*) [defendant raising violation of § 1382 on appeal "must show that the error was a prejudicial one"]; *Avila v. Municipal Court, supra*, 148 Cal.App.3d at p. 812 ["Reversal of a felony conviction on appeal because of a speedy trial error requires a showing of prejudice"].)

Smith makes no attempt to show prejudice, and we deem his silence on the issue a tacit acknowledgment that no prejudice exists.[19] (See *Johnson, supra*, 26 Cal.3d at p. 574 ["defendant by his silence on this issue tacitly concedes the absence of prejudice"].) Smith argues, however, that prejudice should not be required where, as

---

[18] This rule is subject to the caveat that "[w]hen a felony is dismissed pursuant to section 1382, the prosecution may refile the same charge." (*Avila v. Municipal Court* (1983) 148 Cal.App.3d 807, 812.)

[19] Prejudice generally requires a showing that "the statute of limitations would have been a bar to a new prosecution if the motion to dismiss had been granted." (*Wilson, supra*, 60 Cal.2d at p. 152.)

here, the defendant sought pretrial relief and exhausted all pretrial remedies, including seeking review in the Supreme Court. Although he admits that no case expressly so holds, he supports his argument by citing implications, dissents and dicta. We are not convinced.

Smith begins his argument by discussing our Supreme Court's decision in *Wilson, supra*, 60 Cal.2d 139. When the trial in that case was continued beyond the 60-day deadline, the defendant filed a motion to dismiss followed by a petition for writ of mandate. Both were denied. Trial proceeded, and the defendant was convicted of murder. (*Id.* at pp. 142-144.) On appeal, our Supreme Court held there was not good cause for the delay. It also held, however, that "the denial of [the] right to a speedy trial . . . is no more significant than any other error in procedure before trial. It follows that as one who seeks to predicate thereon a reversal of his judgments of conviction, defendant like any other appellant must show that the error was a prejudicial one. (Cal. Const., art. VI, sec. 4 1/2)"[20] (*Wilson*, at pp. 151-152.) Because the defendant could not show prejudice, his conviction was affirmed.

Despite this clear holding that prejudice is required, Smith points to the *Wilson* court's comment that, after the defendant's motion to dismiss and petition for writ of mandate were denied, "defendant failed to petition this court for a hearing." (*Wilson, supra*, 60 Cal.2d at p. 150.) From this one comment, Smith perceives an *implied* rule that prejudice is *not* required if the defendant did everything possible to obtain pretrial relief, including seeking review in the Supreme Court; and because Smith sought review in the Supreme Court after his motion to dismiss and petition for writ of mandate were denied,

_____

[20] Article VI, section 4 1/2, of the California Constitution, now section 13, provides, "No judgment shall be set aside . . . . for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."

24

he argues he need not show prejudice.  He acknowledges, however, that *Wilson* does not actually hold this, and we perceive no such rule in that case.

Smith also notes the dissent in *Wilson* found prejudice was not required, at least where the defendant attempted to obtain pretrial relief, and such relief was "erroneously" or "incorrectly" denied by the trial and appellate courts.  (*Wilson, supra*, 60 Cal.2d at pp. 157-158 & fn. 1 (dis. opn. of Peters, J.).)  Dissents, however, are not the law.

Smith argues the rule he urges us to apply can also be implied from *Johnson*.  As discussed above, the *Johnson* court found there was not good cause to continue the trial beyond the 60-day deadline.  Because the defendant raised the issue on appeal, however, his conviction was affirmed because he failed to show prejudice.  (*Johnson, supra*, 26 Cal.3d at pp. 574-575.)  In holding prejudice was required, the *Johnson* court followed *Wilson*, and noted "[t]hat decision represents a considered policy judgement that defendants should seek review of speedy trial claims before trial."  (*Id*. at pp. 574-575.)  Because Smith *did* seek pretrial review, he argues requiring prejudice "would be inconsistent with the logic of *Johnson*."  Smith reads far too much into this one sentence in *Johnson*, and he ignores its actual holding that "once a defendant has been tried and convicted, the state Constitution in article VI, section 13, forbids reversal for nonprejudicial error."  (*Johnson*, at p. 575.)

Finally, Smith cites the following footnote from *People v. Addison* (1967) 256 Cal.App.2d 18:  "It is possible to read *People v. Wilson, supra*, as standing for the proposition that even if the trial and appellate courts erroneously fail to order a dismissal before trial, to which dismissal the defendant is entitled and the issue of a violation of section 1382 is thereafter raised on appeal from a judgment of conviction, prejudice is not presumed and must be affirmatively shown.  We do not so read the case.  It would be most uncharacteristic of our Supreme Court to award a bonus for error."  (*Id.* at p. 26, fn. 8.)  Like Smith does here, the *Addison* court then noted that the *Wilson* opinion "carefully points out" that the defendant did not ask for a hearing in the Supreme Court.

25

(*Ibid*.)  This entire discussion, however, is dicta because *Addison* did not involve denial of the defendant's right to a speedy trial; it involved the denial of the defendant's right to represent himself.  We are not bound by dicta in a footnote from a sister appellate court.

Because Smith has not established prejudice, his speedy trial contention does not merit reversal.

## B. *Expert Testimony Regarding the Effect of a Lis Pendens*

### 1. *Additional Relevant Facts*

The People presented expert testimony from Joseph Scalia, an attorney with extensive experience in real estate law.  At an Evidence Code section 402 hearing prior to trial,[21] Scalia testified that a property transfer made after a lis pendens has been recorded is legally void or invalid.  Smith objected that this was "incorrect" and "not an accurate statement of the law."  He acknowledged that such a transfer is risky and that the buyer "should be very careful about purchasing that property because of all these dangers that could exist."  He also agreed Scalia could testify that "[i]f we see a lis pendens, we warn to be careful, because you never know what's going to happen down the road.  You may end up losing your property and getting nothing for it if that lawsuit prevails, so be careful about buying that.  [¶] *That, he can say*."  (Italics added.)  Smith argued, however, that a transfer of property subject to a lis pendens is not necessarily void or invalid.[22]  He also argued that testimony about the effect of a lis pendens on a property

---

[21] Evidence Code section 402, subdivision (b):  "The court may hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury; but in a criminal action, the court shall hear and determine the question of the admissibility of a confession or admission of the defendant out of the presence and hearing of the jury if any party so requests."

[22] Smith appears to be right about the law.  According to a leading treatise on California real estate:  "A recorded lis pendens effectively clouds the title to the property described in the notice.  As a practical matter, it may impede or prevent a sale . . . of the property until the litigation is resolved or the lis pendens is expunged.  *It does not legally restrain*

transfer is "a legal conclusion" which an expert cannot offer.

The judge agreed, at least in part, stating "I don't think he can give legal conclusions that go to the heart of this case," and that it was thus "proper to limit some of his conclusionary statements." The judge also agreed, "you can't have him tell the jury that based on the law, he is guilty. That's essentially what he did here today, and I think that's too far. [¶] I don't think he can just flat-out say . . . a transaction out of escrow is void, period. I don't think he can do that. Maybe I'm wrong. You can educate me on that if you think I am wrong, but it seems to like it's going to far." A few minutes later, however, the judge stated, "I think the People can say that if there is a lis pendens, that you can't have . . . a transaction, I think is what he said. [¶] If that's the law, I think he can generally say that." The judge then stated, "nobody has presented me with any black-letter law that that's the case." Halo noted the jury was going to be presented with evidence that there were lis pendens filed on the property, and "[t]hey are going to ask, what is the effect?" The judge replied, "if a jury asks me a question, I try to answer it. And if the answer is it's void, I would tell the jury most likely what the law is." Smith agreed, "that's okay. That's the appropriate way to do so," and the judge then stated, "But I need to know what the law is."

The issue was ultimately resolved when the prosecutor stated, "I am not going to ask him the question of whether the deed is void after they recorded a lis pendens." He stated he intended to argue only that Smith's awareness of the lis pendens was circumstantial evidence of a fraudulent state of mind. He also stated he would *not* elicit

---

*the owner from conveying . . . the property, however*; it merely puts subsequent purchasers . . . on *notice* of the adverse claim." (4 Miller & Starr, Cal. Real Estate (4th ed. 2022) § 10.151, first italics added, fn. omitted; see also *Ward v. Superior Court* (1997) 55 Cal.App.4th 60, 65 ["property subject to a lis pendens remains freely transferrable as a legal matter"]; *Stagen v. Stewart-West Coast Title Co.* (1983) 149 Cal.App.3d 114, 122 ["[t]he buyer could decide to purchase the property regardless of the lis pendens"].)

27

testimony from Scalia to the effect that a transfer after the filing of a lis pendens is necessarily void or invalid: "He cannot testify . . . that the legal effect [of a lis pendens] is you cannot transfer property." The court ordered the prosecutor to limit Scalia's testimony accordingly.

At trial, Scalia testified that a deed conveys title to property and contains implied warranties, including a warranty that the seller owns the property and has clear title to convey. He also testified about the importance of using a title company to buy and sell property. Title companies provide title insurance to the buyer based on their confirmation that title is clean (i.e., the seller has clear title to convey, there are no encumbrances on the property, etc.). If it turns out the seller did not have clear title to the property, title insurance will pay the buyer for any loss suffered as a result. In order to determine whether the buyer has clear title, the title company will prepare a title report; if the title report shows title is not clear, the title company will not issue title insurance. Scalia testified that real estate transactions that do not involve title companies are unheard of. Smith does not challenge any of this testimony on appeal.

Scalia also explained that pending litigation that could affect title to property is material information that the seller and broker must disclose to the buyer. A lis pendens is a document that is recorded in the county recorder's office that provides constructive notice to the world that there is pending litigation about title to a particular piece of property. The existence of a lis pendens is material information about the property and would be "a huge red flag that there is somebody who is fighting over title and possession of the property." A seller who knows about a lis pendens must disclose it to the buyer and cannot guarantee clear title. Moreover, a broker is obligated to investigate and determine if a lis pendens exist. A broker does so by ordering a preliminary title report, which shows who owns the property and discloses "any problems" that might exist with title. Scalia testified he has been involved in more than a thousand cases over 44 years and has never seen a situation where a title report was not obtained. He testified it was

28

"totally reckless" and "irresponsible" not to obtain a title report. Again, Smith does not challenge any of this testimony on appeal.

At some point, the prosecutor asked Scalia, "Can a seller deliver a deed when there is a lis pendens active?" Smith objected, and the judge ordered the prosecutor to reword the question. The prosecutor then asked, "If there is a lis pendens on a property, would there be any problems with a seller conveying that property to the buyer?" Smith objected again, stating, "This is an in limine issue." The judge then excused the jury in order to discuss the issue with the lawyers and Scalia.

During that discussion, the prosecutor stated he intended to ask Scalia the following question: "If a seller knows about a pendency of action . . . , can he convey clear title from another buyer to the new buyer?" Scalia then said his answer would be "No. There is a cloud on title." Smith agreed such testimony would be admissible: "[I]f *the answer simply is there is a cloud on title, that's fine*, but it cannot be any more than that." (Italics added.) The court admonished Scalia that, when explaining the effect of a lis pendens, "don't go so far as to say, then therefore nothing can be conveyed. I think it's okay to let everybody know there is an issue on title so we can just leave it like that."

After the jury was brought back in, the prosecutor asked Scalia the following question: "A seller who knows there is a pendency of action on [the] property, can that seller guarantee to the buyer clear title?" Scalia answered, "No." Smith did not (and does not) object to this testimony.

Finally, Scalia testified that when a lis pendens is filed, the court takes jurisdiction over the property involved in the litigation. On cross-examination by Halo, Scalia testified that a lis pendens can only be removed with court approval because "the court assumes jurisdiction over the property, the parties and the property." The prosecutor then asked a followup question: "[I]if you are not a named defendant or a plaintiff in the lawsuit, the property is still in the jurisdiction of the court?" Scalia responded, "*It's called 'in rem jurisdiction,' which is just a fancy word for -- it's as if the property is*

29

*taken in the court and deposited with the court.* [¶] *The court has complete discretion as to what happens with that property.*" (Italics added.) Smith objected to Scalia's response, and the court stated, "I'll allow that response at that point, and we'll stop it there." Smith subsequently moved to strike Scalia's statement, arguing it "was a violation of the in limine order." The judge denied the motion, stating, "it doesn't really at all affect what you ultimately want to argue in this case. [¶] The court does have discretion, and did ultimately decide that it belonged to Ayers." The judge also stated, "This was a little bit on the line, I suppose, but I don't think it ultimately prejudices the argument that you ultimately want to make here at all."

2. *Legal Standard*

The opinion of an expert is admissible when it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) However, an expert is *not* permitted to give an opinion on questions of law or legal conclusions. (*Palmieri v. State Personnel Bd.* (2018) 28 Cal.App.5th 845, 860 ["the effect of California statutes presents purely legal questions outside the province of expert witnesses"]; *People v. Jo* (2017) 15 Cal.App.5th 1128, 1176 [expert's opinion on a question of law is inadmissible]; *Downer v. Bramet* (1984) 152 Cal.App.3d 837, 841 [expert may not "testify to legal conclusions in the guise of expert opinion"].) "Thus, even lawyers may not testify as to legal conclusions, or ' "state interpretations of the law." ' " (*WRI Opportunity Loans II, LLC v. Cooper* (2007) 154 Cal.App.4th 525, 532, fn. 3.) This is because it is the judge's job to instruct the jury on the law and to decide purely legal issues. (*Summers v. A. L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1178-1182 (*Summers*); see also *Downer, supra*, at p. 842 ["the calling of lawyers as 'expert witnesses' to give opinions as to the application of the law to particular facts usurps the duty of the trial court to instruct the jury on the law as applicable to the facts"].)

"We review the trial court's ruling on the admissibility of expert opinion evidence

for abuse of discretion." (*King v. State of California* (2015) 242 Cal.App.4th 265, 293.) If we conclude the court erred in allowing the challenged expert testimony, reversal is required only if we find it is reasonably probable that Smith would have obtained a more favorable result but for the error. (*Summers, supra*, 69 Cal.App.4th at pp. 1186-1187; *People v. Watson* (1956) 46 Cal.2d 818, 836-837 (*Watson*).)

    *3. Analysis*

    Smith argues Scalia's testimony should not have been admitted or should have been stricken because it is both (1) an opinion on a question of law, which is inadmissible in and of itself, and (2) incorrect. He also argues the error is prejudicial and requires reversal because it obliterated what was otherwise a plausible defense.

    We agree that Scalia should not have been permitted to testify about the legal effect of a lis pendens. Such testimony is inadmissible because it is an opinion on a question of law, and such opinions are never admissible. (See *Palmieri v. State Personnel Bd., supra*, 28 Cal.App.5th at p. 860; *People v. Jo, supra*, 15 Cal.App.5th at p. 1176; *Downer v. Bramet, supra*, 152 Cal.App.3d at p. 841.) Moreover, legal opinions are inadmissible whether or not they are correct. Normally, if an expert offers an opinion that one party believes is wrong, the remedy would be for that party to obtain its own expert. When the expert is an attorney offering an opinion on a legal question, however, this is not a practical option. As courts have noted, " 'testimony on ultimate issues of law by the legal expert is inadmissible because it is detrimental to the trial process. If one side is allowed the right to call an attorney to define and apply the law, one can reasonably expect the other side to do the same. Given the proclivity of our brothers and sisters at the bar, it can be expected that both legal experts will differ over the principles applicable to the case. The potential is great that jurors will be confused by these differing opinions, and that confusion may be compounded by different instructions given by the court.' " (*Summers, supra*, 69 Cal.App.4th at p. 1182, quoting *Specht v. Jensen* (10th Cir. 1988) 853 F.2d 805, 808-809.) Indeed, this potential for confusion is one of

the reasons we do not allow attorney expert witnesses to offer opinions on questions of law. (See *Downer, supra*, at p. 842 ["the calling of lawyers as 'expert witnesses' . . . results in no more than a modern day 'trial by oath' in which the side producing the greater number of lawyers able to opine in their favor wins"].)

Even if the trial court abused its discretion in admitting Scalia's testimony, however, reversal is not required unless Smith can show prejudice—i.e., that it is reasonably probable he would have received a more favorable result absent the error. (*Watson, supra*, 46 Cal.2d at p. 836.) We find that he fails to do so.

The precise testimony that Smith complains of is Scalia's answer to the following question: "So if you are not a named defendant or a plaintiff in the lawsuit [i.e., that is the subject of the lis pendens], the property is still in the jurisdiction of the court?" Scalia responded: "It's called 'in rem jurisdiction,' which is just a fancy word for -- it's as if the property is taken in the court and deposited with the court. [¶] The court has complete discretion as to what happens with that property." From this, Smith posits that the jury was effectively forced to find (1) that property subject to a lis pendens cannot be sold without the court's permission, (2) that Smith must have been aware of this because he was a paralegal, and (3) that Smith thus sold the property knowing it could not be sold. We do not agree that Scalia's testimony supports Smith's theory in this regard. Scalia did not testify that property subject to a lis pendens cannot be sold. He testified that when a lawsuit affecting title to property is filed, the court obtains jurisdiction over the property and has complete discretion over what happens to it. These are two very different concepts.

Moreover, *and more importantly*, we do not agree with Smith that this was a close case, and we are not convinced it is reasonably probable he would have obtained a more favorable result had Scalia's testimony been stricken.

Smith acknowledges there is evidence he was aware of the title dispute between Puschman and Brazeal at the time he sold the property to Reyes and the Askaris. He

contends, however, that he may still have believed he could and would be able to deliver clear title to the buyers. For example, he contends he "may well have believed" that Brazeal's claim to the property was sound and that she was going to prevail in the title dispute. Alternatively, he contends he "might" have believed that even if Brazeal did not prevail, *he* nonetheless had clear title to the property because he recorded his deed before the lis pendens was filed and he was not named in the Puschman petition. Smith argues that Scalia's testimony effectively eliminated the otherwise "plausible possibility" that he believed he would be able to deliver clear title.

The jury, however, was clearly instructed that if Smith mistakenly believed he could deliver clear title, he could not be found guilty of any of the crimes with which he was charged. The jury was given CALCRIM No. 3406, "Mistake of Fact," which instructs as follows: "A defendant is not guilty of any of the crimes charged if he did not have the intent or mental state required to commit the crime because he did not know a fact, or mistakenly believed a fact." And: "If the defendant's conduct would have been lawful under the facts as he believed them to be, he did not commit any of the crimes charged against him." And: "If you find that defendant Shaun Smith believed that he had clear legal title to 9020 Bradshaw Road, he did not have a specific intent or mental state required for any of the crimes charged." And finally: "If you have reasonable doubt about whether the defendant had the specific intent or mental state required for the crimes charged against him in this case, you must find him not guilty of those crimes." Given these jury instructions, Smith fails to convince us that Scalia's testimony effectively precluded the jury from finding Smith lacked the required intent or mental state to commit the crimes charged.

Moreover, with regard to the theft charges, the jury was given CALCRIM No. 1804, which instructs that a defendant is guilty of theft by false pretenses if (1) he or she knowingly and intentionally deceived a property owner by false pretense or fraudulent representation; (2) he or she did so intending to persuade the owner to let him

33

or her take possession and ownership of the property; and (3) the owner let him or her take possession and ownership of the property because the owner relied on the pretense or representation. CALCRIM No. 1804 also instructs that someone makes a false pretense if he or she (1) gives information he or she knows is false; or (2) makes a misrepresentation recklessly without information that justifies a reasonable belief in its truth; or (3) *does not give information when he or she has an obligation to do so*; or (4) makes a promise not intending to do what he or she promises.

In this case, the property owners are Reyes and the Askaris, the property is the money they paid Smith to purchase the property, and the false pretense is that Smith owned the property and thus could sell it to them. Even if Smith did not know at the time that he did not own the property (i.e., because he believed Brazeal was going to prevail in the Puschman petition or because he believed he nevertheless had clear title to the property), the jury could well have found that his failure to let Reyes and the Askaris know there was a legal dispute over ownership of the property was itself a false pretense. Scalia testified that a seller has an obligation to give potential buyers material information about the property, including the fact that there is pending litigation that could affect title—and Smith did not challenge this testimony at trial, nor does he do so here. The jury could reasonably and easily have found that Smith's failure to at least advise Reyes and the Askaris of the existence of a dispute over ownership of the property was a false pretense and was circumstantial evidence of fraud.

Finally, we note that Smith's theory of prejudice does not explain how he could have believed he could sell the same piece of property twice—first to Reyes and then to the Askaris. In his closing argument, Smith's attorney argued Smith sold one half of the property to Reyes, and the other half to the Askaris. The evidence is overwhelming that this is not true. There were two houses on the property: the one that Ayers lived in, and another that was unoccupied. Reyes testified she bought the half of the property with the house that somebody was living in, and that Smith told her he was trying to evict that

34

person, but it was going to take some time. The Askaris testified they also bought the half of the property with that house that somebody was living in, and according to the purchase agreement, the Askaris purchased the *south* half. The sale to Reyes occurred around October 2013, and the sale to the Askaris occurred in 2015. In the meantime, in December 2013, Smith sold half of the property to the Scruggs, who sold it to Reynoso in December 2014 via a purchase agreement that identified the *north* half. When Reynoso purchased the property, the plan was that he and Halo would fix the house up and rent it out. Halo was in charge of getting the house in rentable condition, and he testified he began renovating the house immediately and he "[p]ractically lived there," which clearly could not have happened if Reynoso had purchased the half with the house that Ayers lived in. This evidence clearly establishes that Smith sold the south half of the property (or the half with the house that Ayers lived in) to Reyes, and then turned around and sold that same half to the Askaris; and that he sold the north half (or the half with the empty house) to the Scruggs, who sold it to Reynoso. Selling the same piece of property to two different buyers is all the evidence of fraud the jury needed in order to find Smith guilty of theft by false pretenses.

Reversal is required "only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson, supra*, 46 Cal.2d at p. 836.) Upon an examination of the entire cause, including the evidence, we are of the opinion that it is not reasonably probable Smith would have achieved a more favorable result if Scalia's testimony had been stricken. Accordingly, even if the trial court abused its discretion in allowing the challenged testimony, reversal is not required.

## II

### *Halo's Appeal*

Halo was convicted of four counts of violating section 115, subdivision (a), which

35

provides, "Every person who knowingly procures or offers any false or forged instrument to be filed, registered, or recorded in any public office within this state, which instrument, if genuine, might be filed, registered, or recorded under any law of this state or of the United States, is guilty of a felony." Here, the false instruments are the various deeds to the property,[23] and the recorder's office is the public office in which they were recorded or offered to be recorded. "California courts have long held deeds to be among the class of instruments coming within the purview of . . . section 115." (*Generes v. Justice Court* (1980) 106 Cal.App.3d 678, 683.) California courts have also held that a deed that purports to convey an interest in land that the grantor does not own or in which the grantor has no interest is "false" within the meaning of section 115. (*Generes*, at p. 682; see also *People v. Denman* (2013) 218 Cal.App.4th 800, 809 [defendant filed quitclaim deeds to himself on property in which he had no title or interest; deeds could reasonably be considered false instruments within the meaning of § 115 because "they transferred an interest that [defendant] did not have"].)

Halo does *not* contend that the deeds are not false instruments or that the recorder's office is not a public office within the meaning of section 115. He also does not dispute that the deeds "if genuine, might be filed, registered, or recorded under any law of this state." (§ 115.) Instead, his argument focuses solely on what it means to *procure* or *offer* a deed to be filed or recorded.

Each of the four counts on which Halo was convicted relates to a different deed.

*Count four* involved the grant deed dated June 9, 2015, relating to the Askari transaction. Halo gave the deed to the Askaris, and the Askaris tried to record it, but it was rejected, and was never recorded.

*Count five* involved the grant deed dated September 28, 2015, relating to the

---

[23] There is no suggestion the deeds are forged instruments.

Askari transaction. This deed was recorded on September 30, 2015, by someone who worked for Smith after the deed involved in count four was rejected.

*Count seven* involved the quitclaim deed and *count eight* involved the grant deed, both dated December 19, 2014, and both relating to the Reynoso transaction. Halo had both deeds in his possession, and his plan was to give them to Reynoso once the final payment was made. However, Halo never gave the deeds to Reynoso, and they were never taken to the recorder's office and were never recorded.

Halo argues that a conviction under section 115 requires proof that (1) the deeds were actually recorded, or (2) the deeds were offered or presented to the recorder's office by the defendant himself. As to counts four, seven, and eight, Halo argues substantial evidence does not support his conviction because the deeds were not actually recorded, and/or *he* did not present the deed to the recorder's office, and/or the deeds were never offered or presented to the recorder's office by anybody. As to count five, he argues substantial evidence does not support his conviction because he had nothing to do with the recording of that deed.

### A. Counts four, seven and eight

Again, section 115 provides, "Every person who knowingly *procures* or *offers* any false . . . instrument to be filed . . . or recorded in any public office . . . is guilty of a felony." (Italics added.) As Halo notes, there are two ways to violate section 115: (1) by *procuring* a false instrument to be recorded; or (2) by *offering* a false instrument to be recorded. Halo he argues he did not *procure* or *offer* the deeds to be recorded within the meaning of section 115.

Halo's first argument is that, at the time section 115 was enacted in 1872, the word "procure" was understood solely to mean "cause," and that liability under the procure prong thus requires proof the defendant "cause[d] a false or forged instrument to be recorded," which would also, by definition, require that the instrument actually be recorded. Here, the jury was instructed with CALCRIM No. 1945, as follows:

"To prove that a defendant is guilty of [violating section 115], the People must prove that:  [¶]  1.  The defendant offered a false document for recording in a public office in California.  [¶]  OR  [¶]  2.  The defendant caused a false document to be recorded in a public office in California."[24]

The jury was thus instructed precisely as Halo contends it should have been.

Halo argues there is insufficient evidence to support a finding that he "caused a false document to be recorded" as to counts four, seven and eight, because those counts involve deeds that were never recorded.  We agree, particularly where, as here, no one challenges the jury instructions, and the People state they "will . . . address the issues in the context of the wording of the instructions presented to the jury," and then focus solely on whether the evidence supports the jury's finding that Halo "offered a false document for recording."

Section 115 makes it a felony to "offer[]" a false document "to be filed . . . or recorded in any public office," and the jury was instructed that one element of the crime is that "defendant offered a false document for recording in a public office."  Halo argues the word *offer* means to *present* or *tender* a document for recording, and the People do not suggest otherwise.[25]  Halo argues there is insufficient evidence to support a finding

---

[24]  The jury was instructed on two other elements (knowledge of falsity and document legally entitled to be recorded), but Halo does not challenge them.

[25]  Although Halo asked us to judicially notice a definition of the word "*offer*" from the 1910 edition of Black's Law Dictionary, there is no evidence that the definition has changed over time.  Indeed, the Sixth Edition of Black's Law Dictionary, published in 1990, defines *offer* the same way as the 1910 edition that Halo asks us to judicially notice.  (Black's Law Dict. (6th ed. 1990) p. 1081, col. 2.)  In common usage today, the word "offer" means "to present for acceptance or rejection," "proffer," or "tender." (Merriam-Webster Dict. Online (2022) <http://www.merriam-webster/com/dictionary/offer> [as of Aug. 3, 2022], archived at <https://perma.cc/F44A-KVWM>; Dictionary.com (2022) <www.dictionary.com/browse/offer> [as of Aug. 3, 2022], archived at < https://perma.cc/4C5E-NBDC>.)

38

that he offered the deeds to be filed or recorded. We analyze count four differently than counts seven and eight, and we find the evidence supports Halo's conviction on count four, but not on counts seven and eight.

As to count four, and as characterized by Halo himself, the evidence shows that Halo gave the deed to the Askaris and told them to wait approximately 60 to 90 days before recording it, and that when the Askaris tried to record it, it was rejected. Halo argues he cannot be liable under the offer prong because "Askari, and not Halo, presented the deed to the recorder's office." He acknowledges that, under the offer prong, the document need not actually be recorded, and need only be presented for recording, and we agree. He argues, however, that a defendant cannot be liable under the offer prong unless he or she *personally* presented the document to someone in the recorder's office who was capable of accepting or rejecting it. We disagree.

We find that the crime is committed where, as here, Halo gave the document to the Askaris with the understanding that the Askaris would offer the document to be filed. In *People v. Geibel* (1949) 93 Cal.App.2d 147, the defendant was convicted of offering a forged document to be recorded, in violation of section 115. The forged document in question was a will. In upholding the conviction, the court noted the will "was filed for probate in the office of the county clerk on October 14, 1946." (*Geibel*, at p 169.) The court also noted, "*Whether the document was actually filed with the county clerk by appellant himself or at his behest is immaterial. In either event, the offense is complete.*" (*Ibid*., italics added; see also *People v. Horowitz* (1945) 70 Cal.App.2d 675 [§ 115 conviction upheld where evidence showed defendant hired an attorney to file will for probate and it was attorney who filed the will].)

Similarly, in *State v. Edgar* (1979) 124 Ariz. 472 [605 P.2d 450], the court upheld the defendant's conviction for violating an Arizona statute that is identical to section

115.[26]  In upholding the conviction, the court, relying on *People v. Geibel*, held as follows:  "Defendant argues that he cannot be guilty because he did not file the instruments himself.  We do not agree.  Defendant's actions caused an instrument which he knew contained false information to be placed in a situation whereby the instrument would ultimately be recorded.  'Whether the document was actually filed with the County Clerk by appellant himself or at his behest is immaterial.  In either event, the offense is complete.'  *People v. Geibel*, 93 Cal.App.2d 147, 169 (1949).  The opposite result would shield from liability those who arrange to have others actually record the false instrument."  (*Edgar*, at p. 453.)

Geibel* and *Edgar* are factually distinguishable because in those cases the documents were actually filed or recorded.  However, we find the reasoning of those cases also applies where, as here, the document is offered for recording but is rejected.  We will not interpret section 115 to shield Halo from liability simply because he gave the deed to the Askaris to record.

As to counts seven and eight, Halo argues he cannot be liable because there is no evidence the deeds were ever offered to be recorded by anyone.  Instead, the evidence showed he had the deeds in his possession at all times, and he planned to keep them in his possession until the final payment was made, at which time he would give them to Reynoso to be recorded.  Because the final payment was never made, Halo never gave the deeds to Reynoso, and no attempt was made to record them.  Halo thus argues there is insufficient evidence to find that he offered (or caused) a false document to be recorded.

---

[26]  The statute in question is Arizona Revised Statute section 39-161, and at the time it read:  " 'A person who knowingly procures or offers a false or forged instrument to be filed, registered or recorded in a public office in this state, which, if genuine, could be filed, registered or recorded under any law of this state or the United States, is guilty of a felony.' "  (*State v. Edgar, supra*, 605 P.2d at p. 453 [quoting statute].)  The court noted Arizona Revised Statute section 39-161 was adopted from section 115, and it thus relied on California cases when interpreting the Arizona statute.  (*Edgar*, at p. 453.)

We agree.

During closing arguments, the prosecutor argued, "He [i.e., Halo] said he got it [i.e., the deeds] from Mr. Scruggs and he has it in his possession. These are false. He told Mr. Reynoso he has the deeds. So he is liable for these two deeds because they are false. [¶] . . . He's had it in his possession the whole time." The prosecutor also argued, "the statute doesn't say when you are going to record it. It's just that you are offering it to be recorded, right? And what is the purpose of a deed? The purpose of a deed is to record it, to show ownership. [¶] So eventually it will be recorded. So when he called his nephew and said I got the deeds, he is liable, because he has no deeds [i.e., no deeds that actually transfer clear title], and he is going to record it sometime." In other words, the prosecutor argued that mere possession of the deeds is sufficient if the evidence shows the intent was that they would ultimately be recorded.

Halo argues that mere possession of the deeds is not enough. Again, he argues the word *offer* means to *present* or *tender*, and the People do not suggest otherwise. Here, the deeds were never actually presented or tendered to the recorder's office. Merely possessing a deed is not equivalent to offering it, or presenting it, or tendering it to be recorded the recorder's office.

Halo notes that the Legislature knows how to criminalize mere possession of something, but that it did not do so when it enacted section 115. Section 115 was enacted in 1872. That same year, the Legislature enacted section 432, which provided, "Every person who *has in his possession*, with intent to circulate or sell, any blank licenses or poll-tax receipts other than those furnished by the controller of state or county auditor, is guilty of a felony." (Italics added.) It also enacted section 466, which provided, "Every person *having upon him*, *or in his possession*, a picklock, crow key, bit, other instrument or tool, with intent feloniously to break or enter into any building . . . is guilty of misdemeanor." (Italics added.) Finally, it enacted section 472, which provided, "Every person who, with intent to defraud another, forges, or counterfeits, the seal of this state

41

[or specified other seals], or who falsely makes, forges or counterfeits any impression purporting to be an impression of any such seal, *or who has in his possession* any such counterfeit seal or impression thereof, knowing it to be counterfeited, and willfully conceals the same is guilty of a forgery." (Italics added.) Halo argues this shows the Legislature knows how to criminalize possession, but that it did not do so when it enacted section 115. Section 115 makes it a felony to offer a false document to be filed or recorded; it does not make it a felony to possess a false document with intent to be filed or recorded. " ' "[W]e presume the Legislature meant what it said" ' " when it enacted section 115, and that it intended to criminalize offering a false instrument to be recorded, not merely possessing a false instrument with intent to record it. (*Pineda v. Bank of America, N.A.* (2010) 50 Cal.4th 1389, 1394.)

The People disagree. They argue, "the only offer required under the plain wording of the statute is that at some point the buyer would receive a deed that could be recorded, thereby transferring ownership to the buyer. . . . Here, Halo was in possession of the two deeds, but would only provide them once all the money was paid. That is a sufficient offer for purposes of section 115." We disagree. Again, if the Legislature wanted to criminalize *possession* of the deeds, it would have said so. Instead, it criminalized the act of "offer[ing]" the deeds "to be filed . . . or recorded in any public office." Both a century ago and today, "offer" means "to present for acceptance or rejection." (Black's Law Dict. (2nd ed. 1910) p. 848, col 1; Black's Law Dict. (6th ed. 1990) p. 1081, col. 2; Merriam-Webster Dict. Online (2022) <http://www.merriam-webster/com/dictionary/offer> [as of Aug. 3, 2022], archived at <https://perma.cc/F44A-KVWM>.) The two deeds at issue in counts seven and eight remained in Halo's possession at all relevant times, and were never presented to the recorder's office for acceptance or rejection. Thus, we find that Halo's conviction on counts seven and eight must be reversed.

### B. Count five

Count five involves a grant deed dated September 28, 2015, relating to the Askari

transaction.**27**  According to the Askaris, after the first deed was rejected by the recorder's office, he contacted Halo for help, but Halo did not respond.  The Askaris then contacted Smith, who ultimately prepared a new deed and arranged to have it recorded on September 30, 2015.  We refer to this deed as the September 30 deed.

Unlike the three deeds discussed above, the September 30 deed was recorded, and the issue is whether substantial evidence supports the finding that Halo caused or offered the September 30 deed to be recorded.  Halo argues the answer is no because Smith arranged for this deed to be recorded, and he did nothing to assist Smith in recording it.

According to Halo, the prosecution's theory was that Halo aided and abetted Smith's violation of section 115—and the People do not suggest otherwise.  The jury was given CALCRIM Nos. 400 and 401 regarding aiding and abetting, and was instructed, "A person may be guilty of a crime in two ways.  One, he or she may have directly committed the crime.  I will call that person the perpetrator.  Two, he or she may have aided and abetted a perpetrator, who directly committed the crime.  A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator." (CALCRIM No. 400.)  The jury was also instructed that to prove a defendant is guilty of a crime based on aiding and abetting that crime, the People must prove:  (1) the perpetrator committed the crime; (2) the defendant knew the perpetrator intended to commit the crime; (3) before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; and (4) the defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime; and, "Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."  (CALCRIM No. 401.)  We find

---

**27**  The deed grants "an undivided 50% interest" in the property from STS to the Askaris, and is signed by Smith as CEO of STS.

there is sufficient evidence to support a finding that Halo aided and abetted Smith in recording the September 30 deed.

According to Halo, the *only* thing he did that had any relation to Smith's recording of the September 30 deed was to give Smith's phone number to Askari. Halo argues this is insufficient to support the prosecutor's aiding and abetting theory because Askari already had Smith's phone number by June 2015, which was months before the deed was actually filed.

Halo views his involvement in the recording of the September 30 deed far too narrowly. The evidence shows Halo's involvement extended far beyond providing Askari with Smith's phone number.

Halo had known the Askaris for some time because he was the property manager for a rental unit they occupied. The Askaris owned a restaurant, and Halo would come by to collect rent checks or have a meal, and the Askaris and Halo became friendly. Halo repeatedly told the Askaris they should own their own home.

In early 2015, Halo recommended that the Askaris purchase the half of the property with the main house on it. He told the Askaris an old woman lived in the house and she should not be disturbed. He said he would represent both sides of the transaction, there was no need for a title company or escrow, and he would save them money by handling the transaction. The Askaris were not familiar with real estate and did not know what a title company did. Halo gave the Askaris a schedule for installment payments, instructed them to pay the money directly to him, and explained that he would pay the seller. The Askaris had trouble obtaining some of their money that was in Iran, so they borrowed approximately $40,000 from a friend named Jason Johnson. Halo met Johnson at a Starbucks and drew up a loan contract between Johnson and the Askaris.

By June of 2015, the Askaris were concerned about why they could not see the property and asked to talk to the seller (i.e., Smith). Halo told them Smith was very busy and could not meet them, and that if they did not make the last payment, Smith would be

angry and could keep all their money. Because he had become suspicious of Halo, the Askaris made a final payment of $40,666 directly to STS on June 8. The Askaris also texted Smith on June 15 and asked Smith to contact him about the property.

Halo then gave the Askaris the grant deed dated June 9, 2015, and told them to wait 60 or 90 days before recording it. The Askaris tried to record it but it was rejected. The Askaris were concerned and tried to contact Halo, but Halo stopped responding to their messages. The Askaris then contacted Smith, who ultimately arranged to record a new grant deed on September 30, 2015. This evidence shows Halo's responsibility in brokering and arranging the sale of the property from Smith's company to the Askaris. That it was Smith who ultimately arranged for the deed to be recorded does not relieve Halo of liability for violating section 115 on an aiding and abetting theory.

## DISPOSITION

Smith's judgment of conviction is affirmed. Halo's conviction on counts seven and eight is reversed; in all other respects the judgment is affirmed. The clerk of the trial court is directed to modify its records, prepare an amended abstract of judgment and forward it to the Department of Corrections and Rehabilitation.

/s/
EARL, J.

We concur:

/s/
MAURO, Acting P. J.

/s/
KRAUSE, J.

45